My name is Michaela Steinholt and I represent the United States in this matter. I'd like to reserve five minutes for rebuttal. The District Court erred in suppressing evidence in this case because reasonable suspicion and probable cause were established within the first ten minutes of the traffic stop. Now there are four factors establishing reasonable suspicion and probable cause in this case. First, the driver was excessively nervous. Sgt. Kober testified at the suppression hearing that he was breathing heavy and that he was shaking. Additionally, Sgt. Kober testified that the driver could not explain when questioned why he was so nervous. Secondly, the baggies were unusual and that helped to establish probable cause and reasonable suspicion here. Now the baggies are unusual for a number of reasons as Sgt. Kober testified. First, Sgt. Kober testified that baggies are indicative of drug trafficking. Secondly, the baggies are suspicious because of the driver's furtive and evasive behavior associated with the baggies. Sgt. Kober testified that the driver was hiding and stuffing these baggies underneath his clothes inside the backpack that he was searching. Additionally, Sgt. Kober testified that when he questioned the driver about the baggies, the driver pretended as if he could not hear the question. In fact, he never responded to the baggies except mentioning that one of the baggies was full of a disassembled pellet gun. So the driver's excessive nervousness, the baggies, third, the loaded handgun. It's well established in the Eighth Circuit that guns are tools of the drug trade. Additionally, Sgt. Kober testified that traveling with a loaded handgun is in violation of Iowa's state law. And this added to establishing reasonable suspicion and probable cause. Now fourth, Your Honors, is the rental situation. As Sgt. Kober testified, this was very unusual. Sgt. Kober testified that in his colloquy for asking for traffic stops for rental situations, he asked for the license, the registration, which in cases of rental situations, it's the rental agreement. And then third, if the renter is present. Now here, two out of the three of those circumstances were not present. The driver and the defendant here were unable to produce a rental agreement. And secondly, the renter was not present. As Sgt. Kober testified, this was unusual, especially in the circumstances of a cross-country road trip from Georgia to North Dakota and back again. Additionally, Sgt. Kober testified at the suppression hearing, pages 61 and 62 of the transcript, that based on his training and experience, individuals will use rental cars for criminal activity because it limits their personal liability. Now, these four factors and their subparts establish reasonable suspicion and probable cause within the first ten minutes of the stop. The District Court clearly erred here in determining that, in arguing that the sole mission here, which was the speeding ticket, the original infraction which prompted the traffic stop, was accomplished. And anything beyond that, Sgt. Kober unreasonably extended the traffic stop. That's not accurate. The mission here was not solely the speeding ticket. Initially it was when the traffic stop occurred, but due to the unusual responses and furtive behavior, the four things I just discussed, the mission had expanded because of reasonable suspicion and probable cause were established. Sgt. Kober had to verify the vehicle information. He had to verify the firearm information. He had to verify the criminal histories of the defendants, one of which he did not have his license. How long did the stop ultimately last? I think it was around 40 minutes, is that right? That's correct, Your Honor. What's the time frame that has been upheld as a legitimate stop for a traffic violation such as a speeding ticket? Well, Your Honor, there is no per se time limit in regards to what is a reasonable stop here. Now, in this situation, reasonable suspicion and probable cause were established within the first 10 minutes. Between the 10-minute mark and the 34-minute mark, Sgt. So you're saying the gun and the other items were all found within the initial 10 minutes? Yes, Your Honor. Specifically, minutes 115 is when Sgt. Kober first made contact with the driver, and then he went back to his vehicle at minute 945. And then from 10 minutes to roughly 34 minutes, Your Honor, is when Sgt. Kober was following up on some of which were routine tasks, the registration verification, the firearm registration, the criminal histories of the driver and the defendant here. And that lasted until about the 34-minute mark, Your Honor. So essentially what you're telling me is that where the district judge saw a pretext in that last 34 minutes, the government says what actually happened was that probable cause had been established because of the presence of the gun, the furtive behaviors about the baggies, the inability to explain why they were driving cross-country in a rental car rented to somebody else without the rental agreement or the person who rented the car, the sort of distance traveled in a short period of time, and the distance they still had to travel to get the car back to Georgia, that all of that gave rise to a suspicion of drug trafficking, and that the officer was, in fact, engaging in a drug trafficking investigation at that time with probable cause, and so there is nothing extended about it. That's your argument? Correct, Your Honor. Okay. Now, how do you square that with some of the comments that are kind of with the ride-along about here's what we're going to do. We're going to call those people. We're going to get permission to seize that car, and then we'll do an inventory search because, as you describe it, could have done an automobile search at that point without any other information, right? An automobile exception does apply here, and we argued that that probable cause existed, so Sergeant Cobra could have operated under that route. He could have just started the search 10 minutes in with no other additional information, right? Correct, Your Honor. Right. So, once again, how do we explain a comment away? Well, Your Honor, first, we disagree with the district court's finding that pretext was at issue here. That is not on appeal in front of the court today, but what I would say about that is— What are we to make of the conversation between the police officer and the ride-along about what was about to take place? Well, Your Honors, if you look at United States v. Taylor, which is an Eighth Circuit case here, well, first off, hunches don't equate to pretext. So, U.S. v. Taylor says that it needed to be the sole reason for Sergeant Cobra to extend the stop was this pretextual hunch situation. As I described, these four reasons—the excessive nervousness, the furtive behavior, the numerous baggies that were found, the unique rental situation, the loaded firearm— all these established reasonable suspicion, which permits the extension of the stop. It permits broadening the scope of that mission to prolong the stop. And again, the original justification for the stop was what? It was speeding, Your Honor. Speeding in a 70-zone? That's correct, Your Honor. That's correct, Your Honor. And, Your Honors, the district court here is clearly erroneous in the approach it took to analyzing the reasonable suspicion and probable cause factors. And that being that the court took—it was fairly flawed for two reasons. First, the court took a piecemeal evaluation of the evidence. It reviewed each of those pieces of evidence in isolation. And the Supreme Court in District of Columbia v. Westby, a 2018 case, and United States v. Arvizu, a 2002 case, both found that that is an incorrect approach to evaluating reasonable suspicion and probable cause when what is required is to view the evidence in the totality of the circumstances. Now, the second fatal flaw here in the district court's analysis is his innocent explanations for the suspicious circumstances. Now, first, that's incorrect because the Supreme Court in Arvizu and Westby said that innocent explanations are indicative of that piecemeal approach because the district court is providing innocent explanations to single factors of evidence that should be viewed in their entirety. Secondly, it discards the training and experience of law enforcement. It does not permit law enforcement to draw from their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that might elude an untrained person. You know, I understand that, but should we give any weight to the fact that Judge Bennett is what we would describe exhaustive in all of his opinions? I mean, everything he writes has got an index and a table of contents and 56 pages of explanation. And so, as a result, I mean, it's a writing style perhaps for, I mean, for a lot of judges that, like, if I was to write an opinion that did that and you looked at my writing style, you'd say, well, he has fallen prey to the piecemeal analysis. But with Judge Bennett, is it really fair for us to do that to him? I mean, just given the nature of the way he writes? Judge Bennett is a very thorough, well-respected district judge. But that doesn't mean that he isn't capable of making mistakes. I'm confident that that's true. Not to pick on him. Well, Your Honor, so here we do believe that he engaged in this piecemeal analysis and providing the innocent explanations which the Supreme Court have stated, like I said, in Westby and Arvizu as simply an incorrect approach here. If there are no further questions, I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you, Ms. Steinholt. Mr. Hansen? Hansen, excuse me. Good morning, Your Honors. Brad Hansen on behalf of Dylan Davis. May it please the Court. Judge Erickson used the word exhaustive, and that is an apt description of what happened with respect to the district court and the motion to suppress. The district court, Judge Bennett, granted the motion to suppress only after extensive pre-hearing briefing, after an hours-long hearing featuring extensive testimony from Sergeant Colber, the primary officer involved in the traffic stop. Judge Bennett had the opportunity to review the video of the traffic stop, which is very important in this case as well. After the hearing, Judge Bennett ordered additional briefing, including proposed findings of fact and legal conclusions from both parties, and then responses to the same from both parties. Only after that extensive record was developed, did District Court Judge Mark Bennett issue his opinion, granting Mr. Davis' motion to suppress. And this Court should not set aside Judge Bennett's order in this case. What's our standard of review? The standard of review, Your Honor? Yes. It would be for, it's a de novo review. There's some case law that I cited in my brief, suggesting that the Court has to find an obvious or a clear error in judgment, but ultimately on a motion to suppress it is de novo, Your Honor. The factual findings, however, are reviewed for clear error. Now I do want to raise and address the issue of standing, which Ms. Steenhol didn't spend much time on here today, but the government did address it in its brief. And I think that's an opportunity to give some understanding as to the nature of Mr. Davis' challenge. Mr. Davis' argument is that neither reasonable suspicion nor probable cause existed for a search of the automobile until 39 or 40 minutes into the stop after Sergeant Kober instigated the inventory search, found the methamphetamine pipe under Mr. Pope's seat. So the question from Mr. Davis' perspective is, was the stop improperly extended to that point such that there was a constitutional violation? And when the challenge is understood in that way, it's clear that Mr. Davis does have standing to bring this motion, even though he was a passenger in the vehicle. Do you concede that the officer, that it wasn't an unlawful extension to, in essence, run the driver's license and the registration for the vehicle at that time was acceptable? To run the driver's license, certainly. To check on the identity, identifying information for Mr. Pope and Mr. Davis, certainly. It gets a little trickier when you get to the question of what Sergeant Kober did, rather, with respect to checking on the rental car information. It's clear, and I think this dovetails into the issue of whether the stop was improperly extended, it is important to understand what exactly happened with this stop. And the court made some comments along these lines when Ms. Steinholt was up here. This was a pretextual search of the vehicle and a pretextual extension of the stop. And thank goodness we have the video, because that's what makes it clear. From 12 minutes into the stop, Sergeant Kober is articulating his hunches regarding what he thinks is going on. He mentions he thinks there's a dope bag on the bottom of Mr. Pope's bag, which, for the record, there wasn't actually a dope bag at the bottom of Mr. Pope's bag. He suggests maybe these guys are out robbing banks. He suggests there may be dope in the car. These are things he's saying even before he takes the step of calling Enterprise and confirming, if you will, the information about the rental car. He called Enterprise, not necessarily to confirm the information, but to get the authority to do the inventory search that he wanted to do all along. And that's clear from his comments about 19 minutes into the video when he says, well, I'm going to call Enterprise and essentially get permission to do the inventory to satisfy my hunches. So that's what happened here. It was a pretextual extension of the stop and ultimately a pretextual search of the vehicle. Now, Judge Bennett's opinion talks about the propriety of the actual search of the vehicle, and I do think that's relevant even though Mr. Davis' challenge isn't just to the search itself. The way Judge Bennett put it was it's improper to extend a stop for the purpose of doing an illegal search, basically. And the case... It wouldn't be an illegal search even if the officer had a hunch only to go on if at each step of the interaction with the person he's investigating there's information that continues the ability of the officer to investigate. Isn't that true? I mean, it wouldn't matter even if the officer did have a pretext if the actual investigation begins with a legitimate stop and things that are discovered during the legitimate stop actually do lead to reasonable suspicion and ultimately probable cause. So that, what you're saying, Chief Judge Smith, gets to whether there's reasonable suspicion to extend the stop and probable cause to search, and you're right. And of course our argument is there was not either reasonable suspicion or probable cause before the discovery of the methamphetamine pipe. What I'm saying is the district court's discussion of the propriety of the actual impoundment and inventory search is appropriate because of this principle that you can't extend a stop for the purpose of doing an inventory that would ultimately be illegal. Right. And that's true. But we have this line of cases that talks about, like, well, somebody may have a hunch and they may have an ulterior motive, but it's not pretextual if they actually before that had probable cause, right, because we apply the objective standard to make the determination whether there's reasonable suspicion that leads to probable cause and that even if they're pursuing some bad hunch that would be pretextual, like I want to get the evidence of the bank robbery, right, we'd still say, well, they had probable cause on the drug piece by that point. And so we look at the objective officer as opposed to what was in the black heart of this particular peace officer, right? So up until 39 minutes into the stop, you look to the objectively reasonable officer and consider whether there's reasonable suspicion to continue to stop. After that point, impoundment law is the rare area of Fourth Amendment law where you do actually look to the subjective motivation of the officer. Yeah, and I get that. The question really is, the argument the government's advancing is that whatever you call that thing that we did where we found the evidence, we had full probable cause when we started doing that search. And so under the automobile exception, we were getting there anyhow, right? Even if you pretended it was an inventory search, it really was an automobile exception search, right? Right. And why are they wrong? They're wrong because, as I said at the outset, there was not reasonable suspicion or probable cause until 39 minutes into the stop. And with respect to the government, Judge Bennett made it very clear in his opinion that although he was thorough and discussed each and every factor that Sergeant Colber cited, he said he was considering them both individually and collectively. And he gave kind of a colorful example that makes it clear that he was considering these factors collectively. He talked about, well, if a few empty baggies with a gun was enough for probable cause or reasonable suspicion, then many Iowa hunters out for a picnic would be subject to an extension of a stop and a search. What about the other piece to this that was advanced? They're in a rental car. They admit that they were not the people who rented it. They don't have the documents, and they say, we're driving from North Dakota to Georgia, and we're driving back from this trip where we just drove to drop somebody off. And actually, if you just look at drug trafficking routes generally in our part of the world, that's not an uncommon route to be traveled generally. Any of that fit in, or is that all just post hoc speculation by Ralph? So the nature and the circumstances surrounding the rental agreement, the lack of the renter being present, would be more suspicious if Mr. Pope and Mr. Davis hadn't been so cooperative and truthful when asked about it. They didn't pretend to have the rental agreement. They said they didn't have it. And, in fact, so they didn't know they had to have it because they had been stopped somewhere in the Dakotas and hadn't been yelled at by the cop for not having it. Moreover, they said immediately, and I think it was Mr. Pope, that Carrie Rigdon of Georgia rented this vehicle for us. And that is exactly what Jake from Enterprise told Sergeant Kober before the search was actually commenced and while this stop was being extended, that it was, in fact, true that Carrie Rigdon of Georgia had rented this particular vehicle. So if not for the truthful and cooperative nature of Mr. Pope and Mr. Davis' responses to the situation with the rental car, then perhaps that would have contributed more meaningfully to a finding of reasonable suspicion. But, again, the district court considered all these factors collectively. And the district court didn't only consider the facts that Sergeant Kober cited, but Judge Bennett also considered the facts that were favorable to Mr. Davis in this reasonable suspicion analysis. Again, they were cooperative. They were truthful. When Sergeant Kober turned on his lights, they pulled over immediately. They truthfully identified themselves. Although Mr. Davis didn't have his driver's license, he wasn't the driver, so he didn't have to have his driver's license. The information that Mr. Davis gave to Sergeant Kober turned out to be legitimate. Sergeant Kober goes back to his car with the gun that Mr. Davis was cooperative regarding and explained, in fact, to Sergeant Kober how he could access the magazine. So that, again, favors Mr. Davis' position. He goes back to his car, confirms all the information that Mr. Davis and Mr. Pope provided, finds out they don't have any criminal histories that are worth noting. They're not drug felons or felons in any regard, and it's the district court considering all this information in conjunction with the facts that Sergeant Kober cited as going against Mr. Davis' argument, and the district court made a collective judgment that that did not constitute reasonable suspicion to extend the stop. Now, let's see. You talked about when did it go bad? At the end of the first 39 minutes? Where was the dividing line here between the proper actions by the officer and the illegal action? Our position is that Sergeant Kober's actions that night were not proper at all. You don't think even the speeding stop was legitimate? Oh, sorry, I misunderstood. Yes, the speeding stop was legitimate. As I said in response to your questions, Chief Judge Smith, verifying information is legitimate to a point, of course. All that's legitimate, but as Sergeant Kober testified, the typical speeding stop lasts 10 to 15 minutes. This lasted 25 to 30 minutes longer, up until the point that he had the reasonable suspicion and the probable cause that the government advances at this point. So if you were to say the point at which the stop went bad, you can't really point to a minute or a second in the video, but this stop should have taken no longer than 10 or 15 minutes is the reality. And the reason it took longer was the calling the rental car company or what? What were the factors that extended beyond the legitimate time limit? In my view, the only factor that pushed us beyond, let's say, 15 minutes was the pretextual call to the rental car company seeking permission to get the tow. Now, that happened at 19 minutes, so you might say up until that point it was okay, but between 12 minutes and 19 minutes, Sergeant Kober was articulating his suspicions about what was going on, his hunches of criminal activity. So somewhere in that period is where the stop went wrong, Judge Woolman. I think the overarching theme of Judge Bennett's opinion is that this is behavior that's worth deterring. This was, in fact, again, a pretextual effort to use an inventory search to satisfy hunches. Judge Bennett thoroughly considered the record. He granted the motion to suppress. Unless the Court has any other questions, I'd ask the Court to affirm Judge Bennett's order. I see no other questions. Thank you, Mr. Hanson. Thank you. Ms. Steinholt, your rebuttal. Your Honor, as the defense counsel discussed, being that the driver and defendant were cooperative and that somehow, and truthful in some regards, and that somehow negates reasonable suspicion, but for the reasons I discussed when I first stood up here   were cooperative and that somehow, and truthful in some regards, in that first 10 minutes of the stop to establish reasonable suspicion and probable cause. And at what point did that develop, or was that developed? Can you do the timeline as clearly as your opponent did? Yes. Minute 115 is when Sergeant Cobra actually made contact with the driver after pulling him over. They discuss the rental agreement and the unique circumstances of them not having it. The unusual travel plans. Sergeant Cobra gets the IDs, discusses the baggies, the furtive, evasive behavior associated with the baggies, which are indicative of drug trafficking. His nervous behavior and the loaded firearm all happened between minutes 115 and 930 of the traffic stop. Now, between 945 and 33 minutes and 50 seconds, Sergeant Cobra is going back and forth between dispatch and then EAN Holdings, the parent company of Enterprise, to verify the unusual circumstances surrounding routine questions of normal traffic stops, that being the registration of the vehicle, the firearm to find out if it's stolen, the criminal history of the individuals. And then between minutes 34 and 37, Sergeant Cobra is organizing the tow of the vehicle. And then it's at 2730 approximately, around that time, is when he informs the driver and the passenger of the violation and that they will be towing the vehicle pursuant to the owner, that being EAN Holdings, request to tow the vehicle. And then they talk about giving some rides. And it's at about the 39-minute mark is when the inventory starts and the methamphetamine pipe and rolling papers are found shortly thereafter. I assume the video is in the record. I have not yet viewed it. Yes, Your Honor. Is it going to be the smoking gun for the defense? No, Your Honor, it is not. Why did your opponents refer to it as, thank goodness it's there? Your Honor, that night, Sergeant Cobra had a ride-along passenger with him. Oh, okay. If it's there, we'll view it. It will be interesting to see what our reaction will be. Those of us, which I guess is only me, have not yet seen it. I do have one question about the video and the recording. And that question really is this, is that the defendant in his brief has made much of the fact that when it was confirmed that Cary had rented the car and then handed the car over, the officer never identified that that was consistent with the information that they received and rather went on to say, well, we stopped him on a traffic violation and other suspicious activity, right? And they say that's a misleading statement designed to get permission to tow and inventory the car. Why are they wrong with that analysis? Well, Your Honor, the Sergeant Cobra testified that, they're wrong on that analysis and that to tow, I'm sorry, would you repeat the question, actually? What I was getting at is that they, rather than say, you know, that confirms what they told us, and then they didn't say, well, what we got him on is speeding, and he did have a loaded gun in the car, right? And then if they say tow the car, fine, you know, but instead it says other suspicious activity, which kind of leads us to believe, you know, the only rational response if you own a vehicle that's likely to forfeiture if it's being used in criminal activity is to say snatch that baby, right? And so that's kind of their argument, right? Sure. So why are they wrong? They're wrong, Your Honor, and I see that my time is up. Yes, you may answer the question. Is that the Jake from Enterprise, he didn't cite that. What he cited in his explanation is that they're towing the vehicle because, and it's a little inaudible during the video, Judge Woolman, when you listen to this, but it's roughly between 31 minutes and 34 minutes, that first of all, if they aren't using the vehicle the way that they should, obviously the person renting the vehicle was irresponsible, giving them the vehicle, which she knows she can get in trouble. So in this case, if that's what's going on here, I would tell you that the best thing to do is to tow the vehicle. And Judge Cobra, or Sergeant Cobra testified that he thought that EAN Holdings wanted to tow the vehicle because of the unauthorized drivers, and EAN was allowed to do that because they are the lawful owner of the vehicle. For all those reasons, Your Honor, the government requests that this court reverse the district court's order. Thank you. Thank you, Mr. Tienhold. Thank you also, Mr. Hanson. Thank you for your appearance before the court today and providing argument on the issues in this matter, and we'll take it under advisement.